No. 78,760

In the Matter of FREDERICK G. APT, JR., *Respondent*.

(946 P.2d 1002)

Opinion filed October 31, 1997.

*Marty M. Snyder*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with her on the formal complaint for petitioner.

*Daniel D. Creitz*, of Hines, Ahlquist & Creitz, P.A., of Erie, argued the cause for respondent.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Frederick G. Apt, Jr., of Iola, Kansas, an attorney licensed to practice law in the state of Kansas. Complaints against respondent alleged that respondent violated MRPC 1.1 (1996 Kan. Ct. R. Annot. 257) (competence), MRPC 4.1 (1996 Kan. Ct. R. Annot. 333) (truthfulness in statements to others), MRPC 5.3 (1996 Kan. Ct. R. Annot. 337) (responsibilities regarding nonlawyer assistants), MRPC 8.1 (1996 Kan. Ct. R. Annot. 348) (bar admission and disciplinary matters), and MRPC 8.4 (1996 Kan. Ct. R. Annot. 350) (misconduct).

The facts are not in dispute. Frederick G. Apt, Jr., was retained by Robert and Hazel Irwin of Iola, Kansas, to prepare their wills in May 1981. In July 1993, he prepared joint and mutual durable powers of attorney for them. In October 1993, he prepared new wills for the Irwins.

In January 1995, both Irwins were in poor health. Mr. Irwin was living in a nursing home and receiving Medicaid benefits through the Kansas Department of Social and Rehabilitation Services (SRS). Mrs. Irwin was living at home but preparing to move to a nursing home. Their son, Robert Irwin, Jr., (Robert Jr.) who had their powers of attorney, contacted respondent and requested preparation of documents for the future sale of his parents' home. The home was owned in joint tenancy with right of survivorship. On January 16, 1995, respondent prepared a deed that showed

both of the Irwins as sellers and with no buyer named. The two-page deed was signed on January 16 by Robert Jr. as attorney-in-fact on the first page and the acknowledgement was notarized on the second page.

Prior to the property being listed for sale with a realtor, Mrs. Irwin died testate on January 18, 1995, leaving all of her personalty to her children. At her death, the home passed to her husband pursuant to joint tenancy survivorship. Subsequent to his mother's death, Robert Jr. contacted Allen County Realty regarding listing and selling his father's house. John Brocker of the realty company met with Robert Jr. on January 26, 1995, to inspect the house. On January 27, 1995, Robert Jr. signed a listing agreement.

On February 20, 1995, a potential buyer, James Akers, contacted the realty company after he saw a "for sale" sign in the Irwin yard. After Akers spoke with Jack Franklin at the realty company, Akers deposited $500 earnest money for purchase of the house. Akers later canceled his option to purchase and forfeited the $500 deposit. Prior to Akers' cancellation, respondent had entered Akers' name as grantee on the deed previously signed by Robert Jr. and dated January 16, 1995. A second potential buyer, Tonya Bruce, was located, but a sale was never completed. In June 1995, Terry and Cheryl Sparks purchased the house. In preparation for the June sale to the Sparks, respondent directed his secretary to prepare a new first page of the deed because the original deed listed Akers as the buyer. As mentioned previously, it was also acknowledged on the second page dated January 16, 1995, and showed both Mr. and Mrs. Irwin as the sellers. Apparently the only change made to the documents was the addition of a new first page with the new buyers' names. The deed was signed again by Robert Jr. shortly prior to the June 1995 sale. The deed delivered to the Sparks in June 1995 was dated January 16, 1995, and named both Robert Irwin, Sr., and the deceased, Hazel Irwin, as grantors.

On June 15, 1995, respondent wrote to the Iola SRS office claiming that Mr. and Mrs. Irwin had sold their home to Terry and Cheryl Sparks by warranty deed dated January 16, 1995, and that Mrs. Irwin had passed away shortly after the sale. Respondent claimed that because Hazel Irwin had died after the sale of the

house, one-half of the sale proceeds were included in her estate (to be divided between her son and daughter). Respondent also claimed the remaining half belonged to the surviving husband and could be credited as an asset against his future Medicaid benefits. The panel determined that the respondent's statements of fact and law were false.

On August 14, 1995, following SRS's request for information regarding the sale, respondent wrote a letter again stating that the house had been sold prior to Mrs. Irwin's January 18, 1995, death and that they "were waiting for title requirements and financing by the purchaser." The panel pointed out that a prospective buyer had not been located until February 1995, and the title report was not available until March 1995. Respondent's letter further stated that "[t]he deed was signed and ready for delivery prior to [Mrs. Irwin's] death," even though the purchasers were not located until 5 months after the death, and the deed which was ultimately delivered to the buyers had been signed in June 1995. Respondent's letter also stated: "Since [Mrs. Irwin's] death [occurred] after the sale, those proceeds go to her two children." The panel found that this letter contained false statements of fact and law.

On September 28, 1995, legal counsel for SRS, Reid Stacey, complainant, wrote respondent requesting an explanation for the factual discrepancies contained in respondent's letters. Even though the house had not been listed prior to Mrs. Irwin's death and there was no buyer, respondent wrote Reid Stacey on October 2, 1995, asserting that "[p]rior to Mrs. Irwin's death a valid oral purchase contract was entered into with both parties concerned." Respondent then stated that title and plumbing work was being completed at the time of Mrs. Irwin's death "to meet buyer requirements." He further stated a $500 down payment, which had actually been paid by James Akers, was paid by the Sparks prior to Mrs. Irwin's death. The panel found that these were also false statements of fact.

A complaint was filed. In preparing his response to the complaint, respondent prepared affidavits for others to sign which were false. One affidavit prepared by respondent containing false facts was signed by James Brocker of Allen Realty, who, upon later re-

view, admitted that the affidavit was incorrect. Another false affidavit prepared by respondent and signed by Robert Jr. stated that he had orally listed the house for sale several weeks prior to the formal listing agreement. It also stated that the contract and a pre-appraisal review of the property were made prior to Mrs. Irwin's death and that Robert Jr. was informed of a prospective purchaser named Akers prior to her death. Actually, Robert Jr. had contacted the real estate agency subsequent to his mother's death on January 18, 1995, the property review had occurred January 26, 1995, and Akers did not contact the real estate agency to purchase the home until February 1995, after the for sale sign was placed in the yard.

In his written responses to the Disciplinary Administrator, respondent stated that the formal listing agreement signed on January 27, 1995, was "just clerical delay by Mr. Brocker's agency in not getting a formal listing agreement when he first talked to Bob Irwin Jr." and "prior to the mother's death Mr. John Brocker and his assistant, Jack Franklin, made a physical appraisal of the property and were proceeding to contact sellers." The testimony by Mr. Brocker and Mr. Franklin at the hearing indicated that respondent's statements were false. The panel found that other statements in respondent's written response were also false.

In his testimony before the hearing panel, respondent asserted that it was his legal opinion that intending to sell real estate is the same as completing a sale. Respondent stated that he had other clients who signed deeds and placed them in safe deposit boxes with the understanding that such deeds would be delivered after their deaths. The panel noted that respondent showed no awareness that his practices could provide the basis for defects in marketable title of the land. Respondent defended his handling of the Irwin deeds as "just using what we already had prepared," but admitted such procedure was "laziness or shortcutting."

The panel concluded that by characterizing the Irwin sale as a sale by both of the Irwins prior to Mrs. Irwin's death, and in taking the position that the surviving spouse should receive only one-half of the net proceeds, respondent was, for all practical purposes, committing welfare fraud. The panel further found, albeit through no efforts of respondent, that the total net proceeds from the sale

of the home eventually went to the surviving husband and all credits due SRS were ultimately received. The panel concluded that as a result, SRS suffered no actual loss.

The hearing panel found that the facts established the following violations of the Model Rules of Professional Conduct by clear and convincing evidence:

Rule 1.1—Competence—The hearing panel found that respondent's handling of the Irwin real estate transaction revealed a lack of knowledge, skill, thoroughness, and preparation reasonably necessary for such representation.

Rule 4.1—Truthfulness in Statements to Others—The hearing panel found that respondent made false statements of material facts and law to the Iola SRS office, to the SRS attorney in Topeka, and to the office of the Disciplinary Administrator. The panel noted that while respondent claimed such false statements were the result of mere mistake or misunderstanding, the panel found that respondent had a duty to investigate all of the facts and law before making such statements, which duty he failed to perform.

Rule 5.3—Responsibilities Regarding Nonlawyer Assistants—The panel found that while respondent believed that much of the mishandling of the Irwin conveyance may have been attributable to his long-time secretary, the ultimate responsibility remained with respondent.

Rule 8.1—Bar Admission and Disciplinary Matters—The panel found that respondent knowingly made false statements of material fact in connection with the investigation of the subject disciplinary matter.

Rule 8.4—Misconduct—The panel found that respondent's conduct involved dishonesty, deceit, and misrepresentation. However, the panel did not find respondent guilty of fraud under the clear and convincing evidence standard. Finally, the panel found respondent's conduct adversely reflected on his fitness to practice law.

The panel then considered 14 possible matters in mitigation and found 3 factors applied:

1. Respondent's conduct exhibited no selfish motive.

2. Respondent testified regarding his previous good character and reputation in the community.
3. Respondent committed a 1986 prior disciplinary offense of little consequence.

Out of 10 possible aggravating factors, the panel found 6 factors applied:

1. In view of the possible SRS violation, dishonest motive could not be ruled out.
2. Respondent exhibited a pattern of misconduct by making repeated and consistent untrue statements without any investigation.
3. Respondent committed multiple offenses involving a number of misrepresentations made without investigation.
4. Respondent made false statements to the Disciplinary Administrator's office and prepared two affidavits for third persons to sign that contained false information. Even if such conduct lacked intentional misrepresentations, respondent was under a professional duty to exercise due diligence to ascertain the truthfulness or falsehood of the matters covered.
5. Respondent refused to acknowledge the wrongful nature of his conduct or show remorse.
6. Despite respondent's lengthy experience in the practice of law, respondent failed to apply fundamental principles of Kansas real estate law to the Irwin transaction.

In light of all of these circumstances, the panel recommended that respondent be disciplined by published censure. On April 10, 1997, respondent filed a statement in accordance with Supreme Court Rule 212(c)(1) (1996 Kan. Ct. R. Annot. 218), stating that he would not file exceptions to the report, findings, and recommendations of the hearing panel. The Disciplinary Administrator also recommended that respondent receive published censure.

On July 1, 1997, respondent sent a letter to the Clerk of the Kansas Appellate Courts notifying the Clerk that he had retired from the practice of law effective that date.

When respondent appeared before this court on September 12, 1997, his attorney stated that respondent, who had originally been charged with welfare fraud, a felony, had by a plea agreement en-

tered a plea of no contest to attempted welfare fraud, a misdemeanor, on July 11, 1997. Respondent was placed on unsupervised probation for 1 year and assessed court costs of $134.50.

We find there is clear and convincing evidence establishing the facts and conclusions found by the panel. A majority of the court is of the opinion that respondent's conduct warrants published censure. A minority views respondent's conduct as being more egregious than conduct where published censure is imposed and would impose a more severe sanction.

IT IS ORDERED THAT Frederick G. Apt, Jr., be and he is hereby disciplined by published censure in accordance with Supreme Court Rule 203(a)(3) (1996 Kan. Ct. R. Annot. 193) for his violations of the Model Rules of Professional Conduct.

IT IS FURTHER ORDERED THAT the costs of these proceedings be assessed to respondent and that this order be published in the official Kansas Reports.

SIX, J., not participating.

E. NEWTON VICKERS, Senior Judge, assigned.